IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LORA L. STANLEY *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-CV-4203-JPG |
| | ) | |
| CARRIER MILLS-STONEFORT | ) | |
| SCHOOL DISTRICT NO. 2 *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**GILBERT, District Judge:**

This matter comes before the Court on defendants' motion to dismiss plaintiffs' amended complaint (Doc. 44). Plaintiffs have responded to defendants' motion (Doc. 46) and defendants have replied (Doc. 48). Also pending before the Court is plaintiffs' motion for preliminary injunction (Doc. 3). For the following reasons, defendants' motion will be **DENIED IN PART AND GRANTED IN PART** and plaintiffs' motion will be **DISMISSED** for lack of standing.

## BACKGROUND

Lora Stanley (Stanley) has custody of nine children – three are her own and six are foster children with special needs.[1] As of November 1, 2004, all the children attended school in the Carrier Mills-Stonefort School District (Carrier Mills or the District). November 1, 2004 was the first day of the District's annual Spirit Week. Each day of that week had a theme, and the District encouraged its students to dress accordingly. Those who did received a reward; those who did not

---

[1] Stanley is the biological mother of Joshua, Jessica and McKenna Stanley. She is the licensed foster parent of Kristi Nixon, Jody Rumsey, Darrell Rumsey, Garrett Rumsay, Rayann Rumsey and James Roller.

could receive a reward if they donated a canned good.[2]

November 1 was "Opposite Sex Day." As the name suggests, on that day, the District encouraged students to dress as a member of the opposite sex. Stanley knew how this day affected the student population because her children attended school on Opposite Sex Day the previous year. Stanley complained in 2003 after hearing that her children were offended by the goings-on, but Carrier Mills did nothing. Because she did not want her children cross-dressing, exposed to cross-dressing or stigmatized by the other children for not cross-dressing, Stanley kept her children out of school on Opposite Sex Day 2004. Her objection to Opposite Sex Day is a religious one – she believes cross-dressing is anathema to the Christian values she seeks to instill in her children. *See, e.g., Deuteronomy* 22:5 (New International Version) ("A woman must not wear men's clothing, nor a man wear women's clothing, for the LORD your God detests anyone who does this.").

Though unrelated to Opposite Sex Day, Stanley also complained to District officials of jokes that appeared in District publications, which she and her children felt were demeaning to women. Carrier Mills did not respond to her complaints about the jokes.

Stanley spoke to members of the media of her opposition to Opposite Sex Day. Soon after, she learned one of her foster children, James Roller, was not receiving the special education services due him under his Individualized Education Plan (IEP). In January 2005, Stanley became aware that defendant Richard Morgan, the superintendent of the District, had contacted the Illinois Department of Children and Family Services (DCFS) and reported Stanley as an "unfit" parent. He told DCFS staffers he removed his own children from Stanley's daycare because the conditions were "filthy." He also told them Stanley was "crazy," that she had "deep seeded problems" and that her children

---

[2] The nature of the reward is not apparent from the complaint.

were "in danger." He made it clear to DCFS personnel that he would continue to complain until DCFS took remedial action. Based on Morgan's complaint, DCFS conducted an investigation.

Stanley believes her comments to the media so angered Carrier Mills's officials that they punished her kids excessively and undeservedly. Specifically, she claims one of her foster children, Kristi Nixon, received an excessive number of detentions from Morgan's mother, a substitute teacher. Morgan's mother also questioned Kristi "intrusively and extensively about her home, groceries, bedrooms and sleeping arrangements." Eventually, Stanley felt she had no other choice, and moved her family to a new home so her children would not have to attend school in the District.

Based on the foregoing, Stanley has asserted claims for violations of her First and Fourteenth Amendment rights (via 42 U.S.C. § 1983), defamation, First Amendment retaliation, sexual harassment under Title IX, and intentional infliction of emotional distress. Defendants claim all these claims for relief fail as a matter of law. Morgan also contends he is entitled to the defense of qualified immunity.

## **ANALYSIS**

Defendants have moved for dismissal of all plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiffs. *Moranski v. General Motors Corp.*, 433 F.3d 537, 539 (7th Cir. 2005); *Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir. 2000). The Court should not grant a motion to dismiss unless it appears beyond doubt that plaintiffs cannot prove their claims under any set of facts consistent with the complaint. *McDonald v. Household Intern., Inc.*, 425 F.3d 424, 428 (7th Cir. 2005).

Generally, a court should not grant a motion to dismiss merely because the complaint is

vague or lacking in detail, so long as it pleads "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir. 2002). On the other hand, a plaintiff can plead herself out of court by including allegations of facts in the complaint which demonstrate she is not entitled to relief. *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992).

**I.     Stanley's Free Exercise and Substantive Due Process Claims under § 1983**

Stanley claims Opposite Sex Day deprived her of the right to raise her children according to her Christian beliefs in violation of her rights under the due process clause of the Fourteenth Amendment and the free exercise clause of the First Amendment. Though her children were not technically required to cross-dress, she claims they would have been compelled to do so by the stigma of being "nonparticipating" students. She also claims their mere presence at school that day would have interfered with her right to raise them according to her beliefs and that Opposite Sex Day was unconstitutional as overbroad. Carrier Mills claims the complaint plainly discloses that cross-dressing was not compulsory, insofar as it makes clear that the District did not *force* students to cross-dress and that non-participating students could receive the reward (the only admitted, overt form of district-sponsored enticement) if they donated a canned good.

The First Amendment forbids the States from "prohibiting the free exercise" of religion. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 707 (7th Cir. 2003). It "guards the individual's practice of her own religion against restraint or invasion by the government." *Venters v. City of Delphi*, 123 F.3d 956, 970 (7th Cir. 1997).

A parent has a First Amendment right to raise and educate her children according to her religious beliefs. *Wisconsin v. Yoder*, 406 U.S. 205, 213-14 (1972). When a parent challenges state

action as an impingement on this right, a court must undertake a two-step inquiry. First, it must determine whether the state action complained of substantially burdened the parent's free exercise rights. *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 689 (7th Cir. 1994). If so, the court must balance that burden against the government interest in the challenged activity. *Yoder*, 406 U.S. at 214.

Opposite Sex Day was substantially burdensome if it had a "coercive effect" that operated against Stanley's practice of religion. *Fleischfresser*, 15 F.3d at 689. *Id*. The key issue here is, therefore, coercion. Courts have addressed coercion in a number of contexts. In *Fleischfresser v. Directors of Sch. Dist. 200*, parents claimed the District's reading curriculum, which included books dealing with wizards, sorcerers, giants and other supernatural beings, violated their right to direct the religious training of their children. *Id*. at 683. The Court rejected this claim for several reasons. Most importantly for the purposes of this discussion, it held that the parents failed to show the requisite coercion to state a claim. Including books with fantastical characters simply did not compel the students to do or not do anything of a religious nature. *Id*. at 690. The Court went on to find, however, that the government interest in the reading program clearly outweighed the slight burden imposed on the parents. Similarly, in *Sherman v. Comm. Consol. Sch. Dist. 21 of Wheeling Township*, 980 F.2d 437, 439 (7th Cir. 1992), the Court held that public schools could lead the pledge of allegiance in classrooms without violating the free exercise clause, so long as the students were not compelled to participate. It concluded that nothing in the record supported the conclusion that the students were coerced into reciting the pledge. The teachers did not force children to stand, put their hands across their hearts or speak, and the other students did not harass or bully the nonparticipating students. *Id*. at 442-43. *Sherman* does not stand, as the District suggests, for the

proposition that peer pressure can never amount to actionable coercion. On the contrary, the Court implied that peer pressure might be sufficient under certain circumstances. *See id*.

In her amended complaint, Stanley alleges that her children "would . . . bear the stigma of being singled out" if they attended school and did not participate. (Doc. 28 at 6). Depending on the circumstances, peer pressure accompanied by tacit approval from the administration could certainly amount to coercion. *See id.* at 443. The District's tacit approval of this conduct would be consistent with the complaint inasmuch as Stanley alleged that the stigma would have borne the "imprimatur of the school." (Doc. 28 at 6). The Court is inclined to agree with the District that the cross-dressing is little more of a religious activity or burden on religious activity than the reading of the fantasy novels at issue in *Fleischfresser*. Nevertheless, the Bible contains a clear proscription on cross-dressing. The Court is cognizant that the Old Testament contains a number of directives that may not be compatible with modern life. It is not the Court's place, however, to judge the comparative worth or value of a particular religious dictate or how one chooses to implement that dictate in life.

Without more facts or more convincing arguments from the District this case can be readily distinguished from *Fleischfresser* and *Sherman*. Here, if plaintiffs' allegations are credited, the burden is more onerous and the benefit slight to nonexistent. After all, as the strength of the government interest declines, the less burdensome the burden need be. *See Menora v. Ill. High Sch. Ass'n*, 683 F.2d 1030, 1032 (7th Cir. 1982).

Finally, the Court notes that plaintiffs have not responded to the District's assertion that they failed to establish that allowing Opposite Sex Day is an overbroad restriction on their religious rights. The Court construes their failure to respond to this argument as an admission of the merits

of the District's claim.  *See* S.D. Ill. Local R. 7.1.  Therefore, the Court **GRANTS** defendants' motion on the overbreadth, but **DENIES** it on all other points applicable to Count I.

## II.     Stanley's Defamation Claim

Stanley bases her defamation claim against Morgan on his comments to DCFS.  Recall, he reported Stanley as an "unfit" parent, called her daycare "filthy," said she was "crazy," said she had "deep seeded problems" and said her children were "in danger."  As she has not alleged special damages, her right to recover depends on whether Morgan's statements are actionable as a matter of law.  *See Fried v. Jacobson*, 457 N.E.2d 392, 394 (Ill. 1983).  Four kinds of statements constitute defamation *per se*, statements imputing:  the commission of a crime, infection with a communicable disease, inability to perform or want of integrity to discharge duties of office or employment and prejudice to a party, or lack of ability, in his trade profession or business.  *Kirchner v. Greene*, 691 N.E.2d 107, 113-14  (Ill. App. Ct. 1st Dist. 1998).  To the extent any of his statement fall within these categories, Morgan claims an application of the "innocent-construction rule" renders all of them nonactioanble.  He also claims his statements were merely expressions of opinion and amounted to nothing more than rhetorical hyperbole.

Under the innocent-construction rule, a statement that is defamatory *per se* is not actionable if it is reasonably capable of an innocent construction.  *Solaia Tech., LLC v. Specialty Pub. Co.*, 221 Ill.2d 558 (Ill. 2006).  The rule requires courts "to consider a written or oral statement in context, giving the words and implications therefrom their natural and obvious meaning."  *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 206 (Ill. 1992).  Importantly, only *reasonable* constructions will render a statement nonactionable.  *Id*.  Morgan claims his statements are amenable to an innocent construction because he made them out of concern for the health and safety of Stanley's children.

He has cited to no case applying the innocent-construction rule in this way. A review of the cases applying the rule demonstrates the speciousness of his argument. *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207 (Ill. 1996), serves as a good example. In *Bryson*, the Supreme Court of Illinois applied the innocent-construction rule to defendant's use of the term "slut" to describe a fictional character sharing the same surname as the plaintiff. *Id.* at 1216-17. The defendant claimed its use of the term could reasonably be construed, in context, as meaning "bully." The Court rejected this assertion. Giving the term slut its ordinary meaning and considering the context in which defendant used it, the Court had no difficulty determining that the term was meant to describe plaintiff's "sexual proclivities." *Id.* at 1217. What *Bryson* and other cases show is that the rule protects the use of words that can reasonably be construed as lacking a defamatory meaning; it does not offer protection for admittedly negative words spoken with good intentions. Morgan is essentially claiming his statements were true. That may be so, but a motion to dismiss under Rule 12(b)(6) is not the appropriate vehicle for testing that defense.

Morgan contends that his statements are not actionable under *Pease v. Int'l Union of Operating Eng'rs Local 150*, 567 N.E.2d 614, 619 (Ill. App. Ct. 2d Dist. 1991). There, the court remarked, "[w]ords that are mere name calling or found to be rhetorical hyperbole or employed only in a loose, figurative sense have been deemed nonactionable." *Id*. Notably, however, a statement should only be considered rhetorical hyperbole when it is obviously an exaggeration, rather than a statement of literal fact. *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 208 (Ill. 1992). Here, Morgan cannot reasonably suggest he was exaggerating, when his asserted reason for making the statements was his concern for the well-being of the children.

Finally, Morgan claims his remarks were statements of opinion protected by the First

Amendment. The Supreme Court of Illinois changed its position on the protection afforded statements of opinion (or statements arguably so) after the Supreme Court's opinion in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990). After *Milkovich,* "a statement is constitutionally protected under the first amendment only if it cannot be reasonably interpreted as stating actual facts." *Bryson*, 672 N.E.2d at 1220 (internal quotation marks and citations omitted). Three considerations are relevant in determining whether a statement is an actionable statement of fact:

> [1] whether the language of the statement has a precise and readily understood meaning, while bearing in mind that the first amendment protects overly loose, figurative, rhetorical, or hyperbolic language, which negates the impression that the statement actually presents facts; . . . [2] whether the general tenor of the context in which the statement appears negates the impression that the statement has factual content; [and 3] whether the statement is susceptible of being objectively verified as true or false.

*Hopewell v. Vitullo*, 701 N.E.2d 99, 103-04 (Ill. App. Ct. 1st Dist. 1998); *see generally Solaia Tech., LLC*, 221 Ill.2d 558, 558; *Republic Tobacco Co. v. N. Atlantic Trading Co., Inc.*, 381 F.3d 717, 727 (7th Cir. 2004).

In *Dubinsky v. United Airlines Master Executive Council*, 708 N.E.2d 441, 451 (Ill. App. Ct. 1st Dist. 1999), the plaintiff sued the defendant for, among other things, calling him a "crook" to an audience of forty or fifty people. The court found that statement nonactionable because it was not made in "any specific factual context," which kept it from being objectively verifiable. *Id*. Similarly, in *Piersall v. SportsVision of Chicago*, 595 N.E.2d 103, 107 ((Ill. App. Ct. 1st Dist. 1992), the court held that defendant's statement, "Piersall is a liar," was not actionable because he did not make it with reference to a specific incident, or in any specific context. The court distinguished the circumstances in *Piersall* with those in *Fried v. Jacobson*, where the defendants "made specific charges about the plaintiff with reference to specific facts that plaintiff alleged were not true." *Id*.

at 107 (citing *Fried*, 457 N.E.2d at 392).

Certainly, a visit to Stanley's daycare would disclose whether it was filthy. Morgan made this statement in a specific factual context: Stanley's daycare was so dirty that he removed his kids. Thus, this statement can be reasonably construed as a statement of fact. His statements about her mental state are more general; there is no indication that he said she was crazy (or that she had deep seeded problems) in response to a particular incident. Whether Stanley is indeed unbalanced to the extent that she is unable to be a parent is not readily verifiable. The same is true of her fitness as a parent generally. From Stanley's allegations, it is not altogether clear whether he made the unfit statement in conjunction with all the others, or in a separate complaint to DCFS. Regardless, the statement is too amorphous and general to be objectively verifiable.

Morgan's statement regarding the condition of Stanley's daycare is sufficient to get past each of Morgan's objections. Though his other statements are not actionable by themselves, this does not mean this claim must be dismissed, because the Federal Rules do not require Stanley to plead all the facts relevant to her claim. It is certainly possible that she could put forth additional facts consistent with these allegations showing that Morgan's statements were made in an actionable context. *See Brown v. Budz*, 398 F.3d 904, 908 (7th Cir. 2005). Therefore, Morgan's motion to dismiss this claim is **DENIED.**

### III. Stanley's First Amendment Retaliation Claim

Stanley believes Morgan's complaints to DCFS, the denial of Roller's special education services, Kristi's detentions and Morgan's mother's comments were in retaliation for her comments to the media. To state a claim, Stanley need only allege that she engaged in an activity protected by the First Amendment and that she was retaliated against as a result of that activity. *See Higgs*,

286 F.3d at 439; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Here, Stanley has identified the protected activity in which she engaged and the specific actions taken by defendants in retaliation.

Nevertheless, defendants pray for dismissal of this claim on several overlapping grounds. They claim Morgan's statements are not retaliation, that Stanley lacks capacity to sue on behalf of her foster children, and that she has not exhausted her administrative remedies with respect to the actions taken against James Roller.

Defendants' first argument is premised on the notion that Morgan's alleged slander cannot constitute actionable retaliation. This argument fails for two reasons. First, the Court has rejected Morgan's contention that his statements do not constitute slander *per se*. Second, defendants have offered no support for their contention that statements must be slanderous to amount to retaliation under the First Amendment. All that Stanley need demonstrate is that the actions taken against her would likely have chilled a person of reasonable firmness from continuing to engage in the protected activity. *The Chicago Reader v. Sheahan*, 141 F.Supp.2d 1142, 1144 (N.D. Ill. 2001) (citing *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998)). Defendants have made no arguments on this score, and whether Morgan's comments were slanderous as a matter of law is simply irrelevant.

Defendants also claim Stanley does not have capacity to sue on behalf of her foster children. They ground this assertion in Federal Rule of Civil Procedure 17(c), which provides:

> Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. An infant or incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person.

Clearly, this rule is of little help, in itself, because it is not clear whether Stanley is her foster children's "general guardian" for purposes of this statute. Defendants claim the children are wards of the state, which, if true, would apparently preclude Stanley from asserting their rights in federal court under Rule 17(c). In support of this claim, defendants cite *Nichol v. Stass*, 735 N.E.2d Ill 590, 587 (Ill. 2000). *Nichol*, however, only stands for the proposition that foster parents are independent contractors for purposes of sovereign immunity. *Id*. The court in *Nichol* made its determination on an incomplete record and essentially found that plaintiff's failure to include the appropriate information amounted to a waiver. The case contains no discussion of a foster parent's ability to sue on behalf of her foster children. Defendants' general citation to Rule 17(c) and an irrelevant case are insufficient to meet their burden of showing this claim must be dismissed. Further, Stanley has asserted that defendants retaliated against her by mistreating her foster children. Defendants have not argued that she cannot complain of actions taken against her children for purposes of *her* claim of retaliation.

Finally, defendants argue Stanley cannot base her retaliation claim on the fact that James Roller was not receiving the special education services due him under his IEP because she failed to exhaust her administrative remedies. For reasons unknown, defendants believe Stanley was required to meet the exhaustion requirement of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400-1491. Stanley is not proceeding, however, under the IDEA; rather, she claims defendants retaliated against her for speech protected by the First Amendment. Nevertheless, defendants claim this suit "is an indirect attack on the adequacy of the educational program provided to James Roller." Doc. 45 at 16. Maybe so, but defendants have not cited to any authority saying as much. Without any solid indication that the Court need apply the IDEA's exhaustion requirement to a claim of First

Amendment retaliation, the Court must reject this claim as well. Defendants' motion to dismiss is **DENIED** in this regard.

IV.     **Stanley's Title IX Sexual Harassment Claim**

Stanley's fourth claim is for sexual harassment in violation of Title IX of the Education Amendments of 1972, Pub.L. 92-318, 86 Stat. 373, as amended, 20 U.S.C. § 1681 *et seq*. Stanley contends that the publication of offensive jokes about women and Opposite Sex Day created a hostile environment. Specifically, she claims Opposite Sex Day fostered "a sexually hostile learning environment" because the "boys wore short skirts and large breasts [and] groped themselves as part of the day's activities."

Under Title IX, "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681. A school district can be liable under this section for peer-to-peer sexual harassment. *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 821 (7th Cir. 2003) (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633 (1999)). To state a claim for peer harassment, a plaintiff must show that defendant was deliberately indifferent to sexual harassment, that it had actual knowledge of the harassment, and that it was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id*. (internal quotation marks and citation omitted). The conduct must have a "concrete, negative effect on the victim's education." *Gabrielle M.*, 315 F.3d at 823 (finding that dropping grades and hospitalization meet this standard). Here, Stanley has plainly alleged that the District was aware of the sexually harassing conduct and was deliberately indifferent to it. Thus,

the only question is whether the harassment was so severe or pervasive to be actionable. *See Davis*, 526 U.S. at 633.

Whether sexually harassing conduct is actionable "depends on the constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Id*. at 651 (internal quotation marks and citations omitted). Because of the nature of the school environment, "simple acts of" name-calling and teasing, even when based on differences in gender, are not actionable. *Id*.

Primarily, Carrier-Mills prays for dismissal based on *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 540 (1st Cir. 1995). There, the woman in charge of an AIDS awareness assembly given to high school students repeatedly spoke of masturbation, made numerous sexually explicit statements and participated in sexually suggestive skits with the students. For several weeks following the assembly, students mimicked the sexual activity they witnessed and "generally displayed overtly sexual behavior." *Id*. at 529. Several students and their parents claimed this amounted to sexual harassment in violation of Title IX. *Id*. at 528. The court rejected plaintiffs' claims. First, it found that the assembly's purpose, AIDS education, and the prefatory remarks made by school administrators before it began, made it clear that the explicit sexuality of the program was an attempt to use humor to educate the children. Regarding the sexually suggestive activities which occurred within the student body after the assembly, the court held that the plaintiffs failed to show how the "course jesting, sexual innuendo, and overtly sexual behavior" created an atmosphere that altered the children's educational environment." *Id*. at 541. Importantly, plaintiffs alleged in their complaint that the sexually explicit conduct was directed at those students, regardless of gender, who did not accept the assembly's message. *Id*.

Here, the boys groped themselves "toward" the girls. Thus, this conduct is not saved by the gender neutrality present in *Brown*. After experiencing Opposite Sex Day in 2003, Stanley pulled her children out of school on November 1, 2004. As a result of this and the other activities alleged, she also moved with her children out of the District. These experiences certainly changed their education environment for two days or more.

It bears noting at this point that the Supreme Court has expressed skepticism whether a single instance of peer-on-peer harassment is actionable under Title IX. *Davis*, 526 U.S. at 652-53. Here, at least in terms of the catalyst, this is not an issue because the District was on notice after Opposite Sex Day 2003. In terms of the prevalence of the harassing conduct, the Court is without sufficient facts to make a decision. To make a proper determination of the severity of harassing conduct, the Court needs the details of when, where and how often it occurred. *See Gabrielle M.*, 315 F.3d at 822. Without this information, the Court cannot say that plaintiffs cannot state a claim as a matter of law

The Court is similarly unable to make a determination regarding the jokes that appeared in District publications. Carrier-Mills defends the jokes on one ground alone: because "the publications described in plaintiffs' complaint were distributed to the entire school . . . the complained of actions were not taken on the basis of sex." The Court is at pains to recall a more unconvincing non sequitur. In any event, this argument is underdeveloped and therefore waived. *See Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000); *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000). Defendants' motion to dismiss on this point is **DENIED**.

V.   **Stanley's Claim for Intentional Infliction of Emotional Distress**

Stanley bases her claim for intentional infliction of emotional distress on Morgan's

statements to DCFS. To prevail on this claim, she must establish that Morgan's conduct was "truly extreme and outrageous," that he intended his conduct to cause, or knew that there was a high probability that it would cause, severe emotional distress and that his conduct did in fact cause severe emotional distress. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 79-80 (Ill. 2003). "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are not actionable. *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (citation omitted). "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining its severity." *Id*. (quoting Restatement (Second) of Torts § 46 cmt. j. (1965)).

Morgan asserts that Stanley has pleaded nothing more than insults and indignities. He also points out that he never threatened Stanley or her children physically. Beyond general citations to the legal standard, Morgan has offered nothing but facile assertions unsupported by citation to analogous case law. Unfortunately, plaintiffs have proceeded similarly. If anything, the cases in this area make it clear that the standard applicable in intentional infliction of emotional distress cases is vague. *See, e.g, McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1989). As a result, decisions turn on a number of fact-specific considerations. *Id*. The practical effect of Morgan's deficient brief is that the Court must conduct its own review of the case law, without direction from the parties, to test the validity of his assertions. This is something that this Court need not do. *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1007 (7th Cir. 2004). Simply put, Morgan has failed to meet his burden of showing his entitlement to the dismissal of this claim by failing to point the Court to any case law to support his claim.

The Court will make, however, a few observations. One key fact in the "extreme and

outrageous" calculus is the degree of authority the defendant holds in relation to the plaintiff. *McGrath*, 533 N.E.2d at 809. The greater one's ability to exercise his authority to the plaintiff's detriment, the greater the likelihood that conduct will be found to meet the standard. One such position of authority mentioned in the Restatement is that of a school official. Restatement (Second) of Torts § 46 cmt. e. Though the comment relates to the authority a principal holds over a "schoolgirl," Morgan's position vis-a-vis DCFS and Stanley bears consideration. A countervailing consideration here is the degree to which he believed his objective legitimate. *McGrath*, 533 N.E.2d at 809. As a school administrator, he had a legal obligation to report child abuse and neglect. 325 ILCS 5/4. Though not really mentioned in the complaint, Morgan strenuously asserts in his briefs that he was acting on his good faith belief that Stanley was an unfit parent. If true, this would insulate Morgan from liability for this tort. *McGrath*, 533 N.E.2d at 809. This is a mixed question of law and fact, however, not a question of law. Though the Court finds it likely he will succeed for this reason, this is not the appropriate stage in the proceedings for the resolution of the issue.

**VI.   Morgan's Qualified Immunity**

Morgan claims he is entitled to the defense of qualified immunity with regard to Counts I, III and IV.

Qualified immunity is an affirmative defense that shields government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). Courts undertake a two-step inquiry to determine the applicability of the defense. First, a court must determine whether the conduct as alleged violates a constitutional or statutory right. *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir.

2006). If so, it must determine whether the right infringed upon was clearly established at the time of the alleged conduct. *Id*. The Court has already determined that Stanley is entitled to offer evidence in support of her § 1983, retaliation and sexual harassment claims. Thus, the question is whether these rights were clearly established. This determination "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (internal citation and quotation marks omitted).

> The whole of Morgan's argument on this score is as follows:
>
> In the present case Richard Morgan is entitled to qualified immunity with respect to plaintiff's federal claims because the selection of Spirit Week activities was a discretionary act.
>    Plaintiff's retaliation claims [sic] alleges that her children were denied special education services, excessively and unfairly disciplined and that she was slandered as a result of speaking out against Opposite Sex Day. . . . The right to be free from exposure to an even-handed educational activity was not clearly established at the time of the occurrence complained of.

 (Doc. 45 at 19). The third sentence applies, if at all, only to plaintiffs' claims regarding Opposite Sex Day; it has no application to her retaliation claim (Count III). As Morgan has made no argument with respect to the retaliation claim, the Court cannot find that he has met his burden with respect thereto. Plaintiff only named Carrier-Mills as a defendant in Counts I and IV. Therefore his claims with regard to these Counts are misplaced. In this regard, his motion is **DENIED**.

### VII.   Injunctive Relief and Plaintiffs' Motion for Preliminary Injunction

The Court has an independent duty in all cases to determine whether the parties before it have standing. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).

In addition to their motion for preliminary injunction, plaintiffs seek injunctive and declaratory relief in Count I of their amended complaint. To have standing to assert a claim for declaratory or injunctive relief, a plaintiff "must show that he is in immediate danger of sustaining

some direct injury." *Robinson v. City of Chicago*, 868 F.2d 959, 966 (7th Cir. 1989) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983)).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. 95, 96 (quoting *O'shea v. Littleton*, 414 U.S. 488, 495-96 (1983)).  The plaintiff must show that the defendant is likely to injure her again, *id.* at 105; *Robinson*, 868 F.2d at 966; *see also Roe v. Operation Rescue*, 919 F.2d 857, 864 (3d Cir. 1990), and that the relief she seeks is likely to prevent the injury from occurring, *see Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976).  Here, Stanley has indicated that she and the children have moved from the District.  Therefore, the injunctive relief they request would have no bearing on their situation.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** defendants' motion (Doc. 44) to dismiss on all points except their argument as to overbreadth. The Court **DISMISSES** plaintiffs' motion for preliminary injunction (Doc. 3) for lack of standing and **STRIKES** their prayer for injunctive and declaratory relief in Count I of the amended complaint.

**IT IS SO ORDERED.**

**Dated: September 21, 2006.**

                                       s/ J. Phil Gilbert
                                       **J. PHIL GILBERT**
                                       **U.S. District Judge**